## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HAYDEE URENA, individually, and on behalf of others similarly situated, | : : | Case No.:  2:20-cv-3305 |
| Plaintiff, | : : | |
| v. | : : | |
| VALLEY NATIONAL BANK and DOES 1 through 100, | : : | March 25, 2020 |
| Defendants. | : : | |

## CLASS ACTION COMPLAINT

Plaintiff Haydee Urena ("Plaintiff"), by her attorneys, hereby brings this class and representative action against Valley National Bank and DOES 1 through 100 (collectively "Valley National" or "Defendant").

## <u>NATURE OF THE ACTION</u>

1.    All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal knowledge, as well as Plaintiff's or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.    This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public. Valley National wrongfully charged Plaintiff, and the members of the class, overdraft fees and Non-Sufficient Funds fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, Valley National's policy and practice of charging multiple fees on the *same* electronic item, a practice which violates Valley National's contracts with its customers, who include Plaintiff and the members of the class. In imposing these improper fees, Valley National also uses such terms as "Checks returned for uncollected funds" fees and "ACH Return Fee" without ever defining or explaining these terms. Further, for almost the entire country Valley National Bank does not list any authority on its Fee Schedule for imposing a Non-Sufficient Funds ("NSF") fee "ACH Return" whatsoever, yet alone for imposing such a fee more than once for the same item.  The practice of determining whether to collect a fee for NSF transactions also does not comply with the contract.

4.      This class action also seeks monetary damages, restitution, and injunctive relief due to Valley National's overdraft policies, that includes its practices of charging and collecting overdraft fees on transactions that are not overdraft transactions under the contract; the manner and extent of and collecting overdraft fees; and, the unconscionable collection of fees.  Each of Valley National's practices in collection of such fees violates its contracts with its customers, who include Plaintiff and the members of the class.

5.      The charging for such overdraft and NSF fees also violates federal law, in that Valley National has failed to follow basic prerequisites in its overdraft fee practices as required by Regulation E, 12 C.F.R. §§ 1005.17 *et seq*., of the Electronic Fund Transfer Act, 15 U.S.C.A. §§ 1693 *et seq*., which includes, *inter alia*, (1) providing a separate overdraft fee contract that describes the actual overdraft and non-sufficient funds practice implemented by Valley National, that may be rejected by the customer, and only collecting fees in the manner described by that contract; and, (2) to opt-in customers into this overdraft fee contract consistent with the terms of Regulation E.  Regulation E prohibits Valley National from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions, (12 C.F.R. § 1005.17(b)(1)(i)), if it does not meet the Regulation E prerequisites, but Valley National did charge and continues to charge overdraft fees without meeting these Regulation E prerequisites.

## PARTIES

6.    Plaintiff Haydee Urena is a resident of Paterson, New Jersey and was a customer of Valley National Bank at all times relevant to the class action allegations.

7.    Based on information and belief, Defendant Valley National Bank is a subsidiary of Valley National Bancorp, does business as "Valley Bank," has assets of approximately $30 billion, and currently operates over 230 branch locations in northern and central New Jersey and the New York City boroughs, with its headquarters located in Wayne, New Jersey.  Valley National is a "financial institution" within the meaning of Regulation E, (12 C.F.R. § 1005.2(i)).

8.    Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of Valley National and, upon information and belief, also own and/or operate Valley National branch locations.  Each of defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E, (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term "Valley National" is also inclusive of Defendants DOES 1 through 100.

9.    Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

10.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

11.    At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and

approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

12.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

13.    As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members defined below; and there are numerous members of the proposed class who are citizens of a state different from Defendant.

15.    Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b)(1), because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

16.    Valley National offers its consumers and business banking customers a checking account.  One of the features of a Valley National's checking account is a debit card, which can be used for a variety of transactions, including the purchasing of goods and services.  In addition to receiving a debit card, other features of a Valley National's checking account includes the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (both recurring and non-recurring payments); and other types of transactions

that debit from a checking account.

17.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Valley National assesses overdraft fees, NSF fees, and charges to customers' accounts when it claims to have determined that a customer's account has been overdrawn.

18.     Overdraft fees and NSF fees constitute one of the primary fee generators for banks and credit unions.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.

19.     Since 2000, the average amount of checking account transactions has become much lower because customers, and especially younger customers, use debit cards instead of cash or credits cards for everyday purchases.  That has translated to the average amount of overdraft transactions are lower than in 2000.  However, while the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the average cost of overdraft fees per transaction has gone up from $15 in 2000 to $29 in 2018.

20.     Defendant has far outpaced this high average banking overdraft fee.  Valley National's overdraft and NSF fee is $36 per transaction.  Further, in a practice that is uniquely punitive, unconscionable and financially predatory in the banking industry, it has assessed a charge of $15 for *each* day (after 5 business days) that an account remains negative.  The result are situations, like with Plaintiff, where she had a small negative balance of -7.27 that, in a matter of two weeks, courtesy of one returned bill pay, a service charge and $105 in daily overdraft fees, mushroomed that small negative balance of less than $10 into a negative balance of -$150.27.  That translates to an APR for this small advance in the tens of thousands of percent.

21.     The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4.)  More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled

"Overdrawn", at p. 8.)  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee, (*id*. at p. 10.)

22.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1.)  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3.)  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4.)  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3.)

23.    As a result of banks taking advantage of millions of customers through the unfair practice of charging overdraft and NSF fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years alleging these practices are in violation of the contracts with the consumer and in violation of consumer protection statutes.  The rulings of these cases has predominantly fallen in favor of consumers, forcing the banks and credit unions to repay their customers significant amounts of wrongfully collected overdraft fees.

24.    In response to banks use of overdraft fees as profit centers at the expense of vulnerable consumers, the federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. 12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").

25.    To qualify as affirmative consent, the Opt-In Contract must include, but is not limited to the following:

- The customer must be provided the financial institution's overdraft policy, including the dollar amount of any fees that will be charged for an

overdraft, and the maximum number of fees that can be assessed on any given day (if there is no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available;

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted-in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-In Rule, including fulfilling each of the above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions. On information and belief, although formal discovery will be required to confirm this, to the extent that Valley National engages in a Reg E overdraft program, Valley National did not fulfill these prerequisites.

26. Further, at all relevant times, on information and belief, Valley National has had an overdraft program in place for assessing overdraft fees which, *inter alia*, is: (1) contrary to the express and implied terms of its contract with customers; (2) contrary to Valley National's representations about its overdraft program to its customers; and (3) contrary to its customers' expectations regarding the assessment of overdraft fees.

27. There are three balances in an account: the "balance;" the "collected available balance;" and, the "artificial available balance." The "balance" (sometimes called the "actual balance", "current balance" or "ledger balance") is the money actually in the account, without

7

deductions from the balance for deposits that have already occurred but have not yet been credited to the customer, or holds for expected future debit transactions. It is the official balance of the account. It is the balance provided to the customer in monthly statements, which is the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements. Further, based on information and belief, it is the balance which is used by Defendant Valley National to report its deposits to regulators, shareholders and the public. It is the balance provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of Valley National.

28.    The "collected available balance" is the "balance" less holds placed on certain deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP").

29.    The "artificial available balance" is a completely different calculation than the "collected available balance." Although the "artificial available balance" has the words "available balance" in it like the "collected available balance" does, the "artificial available balance" is an accounting gimmick which takes the "collected available balance" and then further deducts from it pending debit card transactions which have not yet posted (and which might or might not ever post), meaning the money is still in the customer's account.

30.    Another accounting gimmick used by some financial institutions, which on information and belief financial institutions such as Defendant may use, is an "approve positive – post negative" method of calculation. This means while there are sufficient funds in the customer's account at the time of authorization of a debit card transaction to cover the transaction in question, even under Defendant's own improper method of calculating the balance, the Defendant places an immediate hold on the funds involved in the subject transaction and sets them aside, not allowing the amount held to be used for any other transactions. But when using this gimmick, financial institutions, and on information and belief, Defendant, will nonetheless charge an overdraft fee if, at the time the transaction in question "posts," the customer's balance,

according to Defendant, is supposedly in the negative.  In other words, even though Defendant has set aside the specific funds at issue in the subject transaction at the time of authorization of the debit card transaction—when even Defendant itself admits the account was not negative, and Defendant did not allow those set-aside funds to be used for any other purposes—Defendant nonetheless will charge an overdraft or NSF fee on that same non-negative transaction for which it is holding funds if intervening transactions have brought the balance down to a level which the held transaction would now bring into the negative.

31.    Upon information and belief, Valley National collects overdraft and NSF fees based on the "artificial available balance" and/or the "approve positive – post negative" calculation without contracting to this practice with its customers in its contracts.  There is no requirement to use the "artificial available balance" or the "approve positive – post negative" calculation, and during the class period Valley National had no authority or disclosure or statement in any of its contracts with its customers that it would use the "artificial available balance" or the "approve positive – post negative" calculation for purposes of assessing overdraft fees.

32.    Not only is the practice of using the "artificial available balance" or "approve positive – post negative" calculation to determine whether a transaction results in an overdraft or NSF fee contrary to Valley National's contracts with its customers during the class period, but such practices have resulted in Valley National improperly charging unlawful overdraft and NSF fees.

33.    Valley National entered into a uniform written contract with Plaintiff and the other Class Members titled "All About Your Accounts" (hereinafter referred to as the "Account Agreement"), one of which is attached hereto as Exhibit 1.  Nowhere does the Account Agreement authorize Valley National to collect and assess the NSF fees, the overdraft fees, or the daily overdraft fee that it did in fact assess and collect from its customers as alleged herein.

34.    Further, the overdraft and NSF practices of Valley National are inconsistent with Valley National's own internal corporate understanding and training of what constitutes an

overdraft or NSF fee, as evidenced by the following Valley National corporate Powerpoint slide on the issue:

> CONSUMER PRODUCTS AND SERVICES **4**
> Overdraft Protection Programs
> **An overdraft occurs when a transaction** such as a check payment, electronic draft or payment **is presented against an insufficient checking account balance causing the balance to fall below zero.**

*See,* https://www.valley.com/VNB/media/Library/PDFs/CRA/Products_And_Services.pdf

(emphasis added) [last visited on or about March 17, 2020].

35.     The Account Agreement does not authorize nor state that holds will be placed on funds in the account for pending debit card transactions, and that those funds will be subtracted from the customer's "balance" to instead create an "artificial available balance" for the purpose of determining overdraft or NSF fees.  The Account Agreement does not define "sufficient funds," "sufficient available funds" "uncollected funds," or "artificial available balance," each of which are necessary for Valley National to collect overdraft fees based on these internal terms that are not understood by customers.  Nor does Valley National's Account Agreement describe a situation where the "approve positive – post negative" method of calculation would be used to determine the balance available to be drawn upon.  Instead, the Account Agreement, consistent with Valley National's own internal corporate understanding as evidenced in its Powerpoint, that an "overdraft occurs when a transaction…caus[es] the **balance** to fall below zero." (Emphasis added.)

36.     At best for Valley National, although Plaintiff disputes it, there might be an arguable ambiguity as to whether Valley National was allowed to use "collected available balance" rather than "balance" for purposes of assessing overdraft and NSF fees, but under no circumstances is there even an implication that it would use the "artificial available balance" as the balance, meaning an unannounced deduction for pending debit card transactions, for this purpose.  The Account Agreement also does not disclose it would use the "artificial available balance" to assess an overdraft fee on a debit card transaction that was authorized with a positive

balance and posted with a negative balance.  Nor does it advise customers that it uses the "artificial available balance" to determine whether to return items and assess an NSF fee on the returned item.  Further, on information and belief, Valley National did not comply with its own stated "funds availability policy" on deposits.

37.    A second contract was also required for Valley National to collect overdraft fees on certain types of transactions.  Specifically, Valley National was required by Regulation E to provide an Opt-In Contract to Plaintiff and the Class Members which governs the terms under which Valley National may assess Plaintiff and the Class Members overdraft fees for ATM and non-recurring debit card transactions, and must obtain their affirmative agreement to the contract before being allowed to charge overdraft fees for these debit card and ATM transactions.  On information and belief, to the extent that Valley National engaged in a Regulation E overdraft program, it did not comply with Regulation E's requirements.

38.    The importance of Regulation E is highlighted by the fact that the Consumer Financial Protection Bureau's study of financial institutions' actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[1]

39.    On information and belief, Valley National does not have a separate Opt-In Contract that meets the requirements of Regulation E, including, *inter alia*, an adequate description of Valley National's actual practice for applying overdraft fees.  Such a description would include a description of the use of an "artificial available balance" rather than just a "balance" or "collected available balance" or "money in the account".

40.    In fact, on information and belief, Valley National will charge overdraft and NSF fees when the balance contains as much or more money than has been requested.  Valley

---

[1] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf [last viewed on March 26, 2020].

National's practice of charging overdraft and NSF fees, even when there is enough money in the account to cover a transaction presented for payment, is inconsistent with how Valley National's Account Agreement expressly describes the circumstances under which overdraft and NSF fees are assessed.  Further, on information and belief, Valley National did not comply with its own funds availability policy on deposits.  Discovery of Valley National's databases will be required to confirm this.

41.    Valley National also has an improper practice of charging multiple NSF fees for the same electronic item.  Valley National charges a $36 fee when an electronic item is first processed for payment and Valley National determines that there supposedly is not enough money in the account to cover the item (a practice that on information and belief uses the wrong "balance" to make the determination as described above).  Valley National then charges an *additional* NSF fee if the *same* item is presented for processing again, even though the account holder took no action to resubmit the transaction for payment.  This violates the Account Agreement, *inter alia*, at page 2 which states:

> If you overdraw your account, the Bank may, in its sole discretion, either (a) refuse to pay the item(s) that caused the overdraft or (b) pay the overdraft.  The term "item" includes withdrawals accomplished by check, draft or other written order or instruction for the payment of money, in-person withdrawal, ACH entry or other electronic means.  **<u>A non-sufficient funds (NSF) fee will be charged for each overdraft item</u>** regardless of whether the Bank decides to pay or refuses to pay the overdraft. (emphasis added)

In other words, the Account Agreement drafted by Defendant itself states in the singular "a non-sufficient funds (NSF) **<u>fee</u>** (singular) will be charged" for an overdrawn "item," not plural "**<u>multiple non-sufficient funds fees</u>** will be charged" for an overdrawn "item."  Further, "item" means a single electronic transaction.  A "re-presentment" or a "retry" of the same "item" does not change it into a new or different "item."  It is still the same "item" being presented by the same merchant in the same dollar amount, not a new "item."  An electronic item reprocessed

after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes.

42.    Nowhere does Valley National's Account Agreement state that multiple presentments of the same "item" allow it to charge multiple fees for that same "item."  Nowhere does the Account Agreement state that the NSF fee would be "for each presentment of the item" or "per presentment of the item."  It does not even have an adjective such as "debit" in front of the word "item" to arguably create an ambiguity on this issue.

43.    Further, although a Non-Sufficient Funds (NSF) Fee is not even listed as permitted for New Jersey or New York, or any other state except Florida/Alabama, if one were to give Valley National every favorable benefit and allow it to apply the fee it lists for Florida/Alabama also for the rest of the country despite not being listed for these other states, this further confirms that the Non-Sufficient Funds charge is to be "per item," and not "per each presentment of the item:"

- *NSF Fee (Non-Sufficient Funds): $36 per item

(Exhibit 2, page 9.)  If Defendant instead were to try to argue it can charge a Non-Sufficient Funds (NSF) Fee despite an NSF not being on its Fee Schedule because a customer should divine it is the same as an Overdraft Fee, this still does not help Valley National because that fee is also listed as "$36 per item" and not "$36 every time the item is presented" as Valley National does:

Overdrafts: $36 per item

(Exhibit 2, page 4.)  Further, if one were to use the Valley National Fee Schedule available online, it also states identically as follows:

> **Overdrafts $36 per item** (A fee of $15 per day will be applied to any checking account that remains overdrawn for five (5) consecutive business days)

(Exhibit 3; *see*, https://www.valley.com/schedule-of-fees [last visited on March 25, 2020].)

44.    Therefore, when reading the Fee Schedule in conjunction with the Account Agreement, it is not even reasonably arguable by Defendant that there might have been an

ambiguity which allowed Defendant to charge $36 per each presentment of an item rather than $36 per item.   Additionally, there is no authority for an "ACH Return Charge" in the Fee Schedule.  The best-case scenario for Valley National is to conjecture that what it is calling an "ACH Return Charge" it might have meant to call an "NSF Fee."  If correct, this makes Defendant's language regarding fees it will charge even more confusing and ambiguous.[2]

45.    Of note, unlike Defendant, many financial institutions that do engage in this same or similar abusive practice of charging repeat NSF fees for the same "item", at least identify the balance it is based on, and at a minimum state this fact in their Account Agreements and/or Fee Schedules.  They typically use the terminology such as "per presentment" or "per each presentment" to make this clear, and often also add far more in explaining this practice to avoid the term being ambiguous.

46.    The following are some examples from other banks and credit unions that make clear what Valley National was contractually required to do, if it was going to engage in charging multiple $36 NSF fees for the same item:

a.    Air Academy Federal Credit Union contracts for its NSF fee as follows:

"$32.00 **per presentment**."

*See,* https://www.aafcu.com/fees.html (emphasis added) [last visited on or about March 17, 2020].

b.    Central Pacific Bank contracts unambiguously:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

---

[2] To the extent Defendant argues the "ACH Return Charge" is something other than an "NSF Fee", there is no authority to charge it. Further, on information and belief, although formal discovery will be required, Plaintiff alleges in the alternative, on information and belief, that for New Jersey and New York customers there was no adequate authority to charge NSF fees.

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf

(emphasis added) [last visited on or about March 17, 2020].

      c.  Community Bank, N.A. unambiguously contracts:

> **<u>You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned</u>.**

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

      d.  Delta Community Credit Union contracts as follows:

> "$30 **<u>per presentment</u>**."

*See,* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last visited on or about March 17, 2020].

      Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account. **<u>Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected</u>**.

*See,* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last visited on or about March 17, 2020].

      e.  First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **<u>Each presentment is considered an item and will be charged accordingly</u>**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or about March 17, 2020].

     f.   First Hawaiian Bank unambiguously contracts:

> You agree that multiple attempts may be made to submit a returned item for payment and that multiple fees may be charged to you as a result of a returned item and resubmission.

*See,*

https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FH

B_Online_Services_RXP1.pdf (emphasis added) [last visited on or about March 17, 2020].

     g.   First Northern Credit Union lists their NSF fee as:

> "$22.00 **per each presentment and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count

(emphasis added) [last visited on or about March 17, 2020].

     Further, in its Account Agreement, First Northern unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**.  For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again.  If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item.  You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**

*See,*

https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf

(emphasis added) [last visited on or about March 17, 2020].

     h.   Glendale Federal Credit Union lists their NSF fee as:

> "$30 **per presentment**."

*See,* https://glendalefcu.org/pdf/fees.pdf (emphasis added) [last visited on or about March 17, 2020].

    i.   Klein Bank contracts unambiguously:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*See,* https://kleinbankonline.com/bridge/disclosures/ib/disclose.html (emphasis added)

[last visited on or about March 17, 2020].

    j.   Liberty Financial contracts its NSF fee as:

> "$27.00 **per presentment**."

*See,* https://liberty.financial/about/fee-schedule/  (emphasis added) [last visited on or about March 17, 2020].

    k.   Los Angeles Federal Credit Union lists its NSF fee as:

> "$29 **per presentment**."

*See,* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last visited on or about March 17, 2020].

    l.   Members First Credit Union contracts unambiguously:

> We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.]

*See,*

http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf

(emphasis added) [last visited on  or about March 17, 2020].

m.  Meriwest Credit Union lists its fee as:

"$35.00/item **per presentment**".

*See,* https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf

(emphasis added) [last visited on or about March 17, 2020].

n.  Partners 1st Federal Credit Union contracts unambiguously:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See,* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

o.  RBC Bank unambiguously contracts:

"We may also charge against the Account an NSF fee for each item returned or rejected, **including for multiple returns or rejections of the same item**."

*See,* https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

p.  Regions Bank contracts unambiguously:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last visited on or about March 17, 2020].

q.  Tyndall Federal Credit Union lists its NSF fee as:

"$28.00 **per presentment** (maximum 5 per day)."

*See,* https://tyndall.org/member_center/document_center/fee_schedule (emphasis added) [last visited on or about March 17, 2020].

      r.   USE Credit Union states unambiguously :

> "**<u>Fees are charged per presentment, meaning the same item is subject to multiple fees if presented for payment multiple times</u>**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf (emphasis added) [last visited on or about March 17, 2020].

      47.    Unlike these other financial institutions, Valley National does no such thing.  It does not disclose or contract that it assesses multiple NSF fees on a single item, or charges "per each presentment."  If Valley National wanted to engage in this abusive practice, it at least was required to state and contract so, as these other financial institutions all do.  All of these quotations show that banks and credit unions know how to contract for this unambiguously if they want to charge more than one fee for the same "item," and they differentiate between an "item" and the "repeat presentment of the item" when calculating NSF fees.  In contrast, Valley National nowhere states that it will assess an NSF fee "per each presentment of the item," but instead contracts it will charge   an NSF fee(singular) "per item" (not "per each presentment of the item").  However, in practice Valley National charges the fee "per each presentment of the item" rather than "per item" as it stated it would. A resubmission of the same item or transaction does not create a new "item," and cannot result in an additional NSF fee, pursuant to Valley National's own contracts.

      48.    Valley National's practice of charging multiple NSF fees for a single electronic transaction is particularly egregious because, as described, Valley National assesses such fees using an improper calculation of the balance available in a customer's account (the "artificial available balance") and/or on an "approved positive-post negative" fee basis after holding the authorized funds, causing additional confusion and ambiguity.  On information and belief, Valley National therefore often charges an overdraft or NSF fee improperly, and that improper

$36 deduction from a customer's balance further decreases the "balance," generating even more NSF fees or overdraft fees.

49.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts. Plaintiff did not and could not have, exercising reasonable diligence, discovered both that (1) she had been injured; and, (2) the actual cause of that injury until she met with her attorneys in or about February 2020.  This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and, also additionally equitably estop Defendant.

50.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.  Plaintiff was harmed by Defendant's policy and practice of charging multiple fees on the same item.  As stated, Plaintiff entered into contracts with Valley National during the relevant class periods wherein Valley National contracted to charge overdraft fees or NSF fees only as allowed and contracted to in the contracts between Valley National and its customers, and as allowed by law.  Valley National breached its contracts with Plaintiff by charging multiple NSF fees on the same item, by charging overdraft or NSF fees when there was enough money in the account to cover the transaction, and by charging an ACH Return Charge that was not mentioned or agreed to in the contract.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee.  However, to give one example, on July 1, 2015, Plaintiff was charged a $35 "ACH Return Charge" for a $1,459.44 item when according to Defendant there supposedly were insufficient funds in the account to cover the item.  One day later, Valley National again charged Plaintiff another $35 "ACH Return Charge" for the same $1,459.44 item when it was re-presented, thereby charging two NSF fees for the same "item."  To give another example of damages, on June 24, 2015, Defendant charged what it is calling an "ACH Return Charge" of $35 on a $1,503 payment when, on information and belief, there were sufficient funds in the account to cover the item.  As another example of damages, on June 3, 2015, Plaintiff was charged a $35 "ACH Return Charge" for a $7.99 item

when on information and belief there were sufficient funds in the account to cover the item.  As another example of the damages, on July 13 through July 21, 2015, Plaintiff was charged seven separate $15 "Daily OD Fee" charges, or a total of $105 "Daily OD Fees," for a negative balance that before those fees was only -$7.27.  This is unconscionable.  Plaintiff believes that Defendant's database will reveal numerous other and different examples of the improper charging of more than one NSF fee for the same, and of the improper charging of fees when there was enough money in the account to cover the transaction, and so alleges.

51.    Moreover, the assessment and unilateral taking of improper overdraft or NSF fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which Valley National assesses further overdraft or NSF fees.  This practice was deemed to be deceptive and substantially harmful to customers by the CFPB, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)  A complete evaluation of Valley National's records is necessary to determine the full extent of Plaintiff's harm from this practice.

52.     Additionally, because the Account Agreement did not describe Valley National's actual overdraft service, and/or because it contained other deficiencies, to the extent that Valley National engaged in a Regulation E overdraft program, if at all, Valley National violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions. Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation E, Valley National failed to obtain Plaintiff's fully informed consent as required by Regulation E in order for Valley National to be authorized to charge such overdraft fees.  Because Valley National was not legally authorized to enroll Plaintiff into the program for non-recurring debit card and ATM transactions, Valley National violated Regulation E when it assessed any overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

53.     Plaintiff was harmed by these practices when she was assessed overdraft fees and NSF fees when she should not have been. A complete evaluation of Valley National's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

54.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

55.     Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following Class.

56.     The "Class" is composed of three classes:

**The Repeat NSF Class:**

> **All United States residents and businesses who have or have had accounts with Valley National Bank who incurred an NSF fee more than once for the same item during the period beginning six years preceding the filing of this Complaint and ending on the date the class is certified.**

**The Account Balance Class:**

> **All United States residents and businesses who have or have had accounts with Valley National Bank who incurred an overdraft fee or NSF fee when**

**the balance in the checking account was sufficient to cover the transaction at issue during the period beginning six years preceding the filing of this Complaint and ending on the date the class is certified.**

**The Regulation E Class:**

**All United States residents who have or have had accounts with Valley National Bank who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the date the class is certified.**

57.     Excluded from the Classes are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

58.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

59.     **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believe that the Classes are likely to include thousands of members based on the fact that Valley National has approximately $30 billion in assets and operates approximately 230 branches in four  states.

60.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Valley National's customers have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other

publications.

61.    **Commonality** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

    a.    Whether pursuant to contracts entered into between Defendant and Plaintiff and the Class Members, Defendant was contractually authorized to collect and assess the overdraft fees, NSF fees and overdraft daily fees complained of herein;

    b.    Whether, pursuant to the Account Agreement and/or Fee Agreement, Defendant contracted that it would charge more than one NSF fee for the same item;

    c.    Whether the Account Agreement and Fee Agreement are ambiguous on the issue of how many NSF fees Defendant would charge for the same item, whether it would charge an NSF "for each presentment of the item" or "per item";

    d.    Whether Defendant breached the Account Agreement, Opt-In Agreement and/ or Fee Schedule by collecting and assessing overdraft fees or NSF fees for transactions when customers' checking accounts contained enough money to cover the transactions;

    e.    Whether Defendant's Account Agreement was ambiguous on the issue of whether it would use a customer's "balance" or "collected available balance" or "artificial available balance" when determining whether to assess NSF fees or overdraft fees for transactions;

    f.    Whether the language in the Account Agreement accurately described Defendant's overdraft services pursuant to which Defendant assessed overdraft fees and properly opted-in customers; and

g.      Whether Defendant's Opt-In Contract—to the extent Defendant

engaged in a Regulation E overdraft program—accurately described Defendant's

overdraft services pursuant to which Defendant assessed overdraft fees and

properly opted in customers.

62.      **Typicality** – Plaintiff's claims are typical of all of the members of the Class.  The

evidence and the legal theories regarding Defendant's alleged wrongful conduct committed

against Plaintiff and all of the Class Members are substantially the same because all of the

relevant agreements between Defendant and its customers, including the Account Agreement and

Fee Schedules, were identical as to all relevant terms, and also because, *inter alia*, the challenged

practices of charging customers for overdraft fees or NSF fees when there were sufficient funds

in the accounts to pay for the transactions at issue, and of assessing multiple NSF fees for the

same electronic item, are uniform for Plaintiff and all Class Members.  Accordingly, in pursuing

her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other

Class Members.

63.      **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class

Members. Plaintiff has retained competent counsel experienced in class action litigation to

ensure such protection.  There are no material conflicts between the claims of the representative

Plaintiff and the members of the Class that would make class certification inappropriate.

Plaintiff and her counsel intend to prosecute this action vigorously.

64.      **Predominance and Superiority** – The matter is properly maintained as a class

action under Federal Rules of Civil Procedure, Rule 23(b)(3) because the common questions of

law or fact identified herein and to be identified through discovery predominate over questions

that may affect only individual Class Members.  Further, the class action is superior to all other

available methods for the fair and efficient adjudication of this matter.  Because the injuries

suffered by the individual Class Members are relatively small, the expense and burden of

individual litigation would make it virtually impossible for Plaintiff and Class Members to

individually seek redress for Defendant's wrongful conduct.  Even if any individual person or

group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

65.    Plaintiff does not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Defendant resides in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

66.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

67.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

a.    Without class certification and determination of declaratory, injunctive,

statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

      1.  Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

      2.  Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

     b.     Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

      1.  The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

      2.  The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

      3.  The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

      4.  The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

68.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

69.    Plaintiff and each of the Class Members entered into an Account Agreement, such as attached hereto as Exhibit 1, with Defendant covering the subject of overdraft and NSF transactions.  This contract was drafted by and is binding upon Defendant.

70.    Nowhere did the Account Agreement state that Valley National would assess an additional NSF fee every time the same electronic item was re-presented for processing or submitted as a "retry."  Valley National wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Agreement.  This also contradicted its own Fee Schedule which said that an NSF fee would be "per item" not "per each presentment of item."

71.    Further, in the Account Agreement, Defendant promised that Valley National would assess overdraft or NSF fees only when the transaction caused the balance to fall below zero.  This is consistent with its own internal corporate teaching that, "**An overdraft occurs when a transaction . . . is presented against an insufficient checking account balance causing the balance to fall below zero**." *See,* https://www.valley.com/VNB/media/Library/PDFs/CRA/Products_And_Services.pdf [last viewed on March 26, 2020].

72.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

73.    Defendant breached the express and implied terms of the Account Agreement and Fee Schedule by, *inter alia*, assessing multiple NSF fees for the same electronic item, and by assessing overdraft or NSF fees when there was more than zero in the account when covering the transaction at issue.

74.    As a proximate result of Defendant's breach of contracts, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

75.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

76.     Plaintiff and each of the Class Members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement contract which covers overdraft fees and NSF fees, as well as the Fee Schedule as a related document.  The contracts were drafted by and are binding upon Defendant.

77.     In the contracts, Valley National promised that it would only assess "a fee" (singular) when it determined a customer did not have enough money in his or her account to cover an "item," not multiple NSF "fees" for the same "item." In the Fee Schedule it stated the NSF fee would be "per item," not "per each presentment of an item."  Defendant also promised that it would only assess overdraft or NSF fees when the balance would go below zero.

78.     Further, good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

79.     The material terms of the contracts therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

80.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms

and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

81.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple NSF fees for the same electronic item, and of assessing NSF or overdraft fees when there was enough money in the account to cover the transaction, and, in the alternative, on information and belief, of charging fees such as "ACH Return Fees" without authority. Defendant could easily have avoided acting in this manner by simply changing the programing in its software to  charge only an NSF "per item" as its own Fee Schedule stated it would do, and to charge overdraft fees and NSF fees only when there really was a "negative balance" as its account agreement stated.  Instead, Defendant unilaterally elected to and did program its software to create accounting gimmicks which would maximize its overdraft and NSF fees.  In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

82.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment/Restitution)**

83.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

84.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

85.    Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Further, on information and belief, and in the

alternative, the charging of fees such as "ACH Return Fees" was without authority, and also conferred benefit on Defendant. Defendant has knowledge of these benefits, as well as the wrongful circumstances under which the moneys were conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds, Defendant would be unjustly enriched. Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

86.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

87.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

88.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members. Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Violation of Electronic Fund Transfers Act (Regulation E)
### 12 C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.))

89.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

90.     To the extent that Defendant had a Regulation E overdraft fee program in place, by charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E (12 C.F.R. §§ 1005 *et seq*.), whose "primary objective" is "the protection of consumers," (12 C.F.R. § 1005.1(b)), and which "carries out the purposes of the [Electronic Fund Transfer Act, (15 U.S.C. §§ 1693 *et seq*.), the "EFTA"], (12 C.F.R. § 1005.1(b)), whose

express "primary objective" is also "the provision of individual consumer rights," (15 U.S.C. § 1693(b)).

91.    Specifically, to the extent it operated a Regulation E overdraft program, the charges violated what is known as the "Opt-In Rule" of Reg E.  (12 C.F.R. § 1005.17.)  The Opt-In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  (*Id.*)  The notice "shall be clear and readily understandable."  (12 C.F.R. § 205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

92.    The intent and purpose of this Opt-In Contract is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

93.    To the extent it participated in a Regulation E overdraft program, Valley National failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent

before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  Valley National has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17.

94.    As a result, Valley National has harmed Plaintiff and the Class.

95.    As the result of Valley National's violation of Regulation E 12 C.F.R. § 1005.17, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit.

### SIXTH CAUSE OF ACTION
### (Violation of N.J.S.A. § 56:8-1, *et seq*., the Consumer Fraud Act)

96.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

97.    The NJCFA protects consumers from "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J.S.A. § 56:8-2.

98.    Defendant entered into contracts with its consumer customers in which Defendant chose the language to bind the parties relating to the definition of "overdrafts" and the circumstances when Defendant was authorized to assess and collect overdraft and NSF fees from customers' accounts.  Defendant contracted with its customers so as to allow it to assess and collect overdraft and NSF fees only when the posted transaction resulted in a negative account balance, and did not contract to charge multiple NSF fees on the same item.

99.    Defendant has engaged in, and continues to engage in, unlawful conduct as a general business practice by breaching those contracts and misrepresenting its practices in the contracts.  Specifically, contrary to what Defendant states is its practice in the contracts, Defendant uniformly and as a matter of policy assesses and collects overdraft fees on posted

transactions with a positive account balance, and charges more than one NSF fee for the same item.

100.    By engaging in the above-described practice and the actions, unconscionable commercial practices, and omissions herein alleged, Defendant has committed one or more unlawful acts in violation of the NJCFA.

101.    Had Plaintiff and Class members known the actual facts or legal implications of those acts, they would have avoided the overdraft fees and/or repeat NSF fees on the same item. Therefore, a causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiff and the members of the Class.

102.    By reason of the foregoing, Defendant has been improperly and unjustly enriched to the detriment of Plaintiff and the Class in an amount to be proven at trial.  Plaintiff and the Class are entitled to have Defendant disgorge and restore to Plaintiff and the Class members all improperly taken monies as a result of their conduct as alleged herein.

103.    Defendant's conduct caused Plaintiff and Class members to suffer an ascertainable loss.  In addition to direct monetary losses, Plaintiff and the Class members have suffered an ascertainable loss in that they received less than what was promised to them by Defendant in their account agreement and fee schedules.  Therefore, Plaintiff and the Class are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

104.    As a result, Plaintiff and the class have suffered an ascertainable loss of monies and pursuant to N.J.S.A. § 56:8-19 are entitled to threefold damages.

105.    Unless Defendant is enjoined from continuing to engage in this business practice, Plaintiff and the Class will continue to be injured by Defendant's wrongful actions and conduct. Therefore, Plaintiff and the Class are entitled to injunctive relief.

## **PRAYER**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.      For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.      For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.      For statutory damages;

5.      For treble damages;

6.      For an order enjoining the wrongful conduct alleged herein;

7.      For costs;

8.      For pre-judgment and post-judgment interest as provided by law;

9.      For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

10.     For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: March 26, 2020                    Respectfully submitted,

*/s/ Michele M. Vercoski*
Michele M. Vercoski, NJ Bar No. 031012004
mmv@mccunewright.com
Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
David C. Wright, CA Bar No. 177468*
dcw@mccunewright.com
**MCCUNE • WRIGHT • AREVALO LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Elaine S. Kusel, NJ Bar No. 319302020
esk@mccunewright.com
**MCCUNE • WRIGHT • AREVALO LLP**
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**MCCUNE • WRIGHT • AREVALO LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

Taras Kick, CA Bar No. 143379*
Taras@kicklawfirm.com
**THE KICK LAW FIRM, APC**
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

Attorneys for Plaintiff Haydee Urena and the
Putative Class

*_Pro Hac Vice_ applications to be submitted